**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| | * | |
| | * | |
| v. | * | Case No.: RWT 10cr600 |
| | * | |
| | * | |
| **GRACIE BELLOSI-MITCHELL** | * | |
| | * | |
| | * | |
| | * | |
| | * | |

## MEMORANDUM OPINION

Pending before the Court is Defendant Gracie Bellosi-Mitchell's Motion to Suppress Medical Records.  As explained below, her motion will be denied because she did not have a reasonable expectation of privacy with respect to the records in question.  Moreover, even assuming that she had a reasonable expectation of privacy, the warrantless search of her medical records was valid under the doctrine of consent.

## I.  Background

Bellosi-Mitchell operated a tanning salon called "Just Tan It" in a shopping center located at 10086 Southern Maryland Boulevard in Dunkirk, Maryland.  On March 27, 2010, there was a fire at the shopping center.  In the course of the investigation, Deputy Fire Marshal John A. Nelson received a call from James Nielson, a Home Depot Protection Specialist. Nielson told the Deputy Fire Marshal Nelson that store surveillance video captured the Bellosi-Mitchell and three other individuals purchasing materials that were used in the fire.  As a result of this tip and other corroborating information, on March 29, 2010 and March 30, 2010 members of the Calvert County Sheriff's office obtained three search warrants for her home located on 12120

Dunleigh Court.  During the execution of these search warrants, law enforcement uncovered and seized large amounts of Schedule II narcotic drugs, including hydrocodone, oxycodone, methadone, amphetamine salts, as well as cash and unfilled prescriptions written by Dr. Ronald Hairston, who is now deceased.

In June 2010, after discovering the prescriptions written by Dr. Hairston in the Bellosi-Mitchell home, detectives with the Calvert County Sheriff's Office and agents with DEA began investigating whether Dr. Hairston issued prescription of controlled substances for no legitimate medical purpose.  Law enforcement officials spoke with three sources that described Bellosi-Mitchell's history of obtaining prescriptions for controlled substances from Dr. Hairston, filling those prescriptions and selling the controlled substances to third-parties.

Based on this information, DEA Task Force Officer David Jacobs applied for and obtained a search and seizure warrant for Dr. Hairston's office located at 7306 Central Avenue in Capital Heights, Maryland from a United States Magistrate Judge.  This warrant authorized the seizure of the records of patients that had been identified by investigators as patients for whom Dr. Hairston had prescribed large amounts of controlled substances.  Gracie Bellosi-Mitchell does not appear to be one of the patients listed in the search warrant.

On September 8, 2010, federal agents executed the search warrant at Dr. Hairston's medical office. Pursuant to the warrant, agents seized, among other items, medical records specific to the patients listed in the search warrant attachment and materials related to Dr. Hairston's prescription of controlled substances. Dr. Hairston was present for the execution of the search warrant.

Dr. Hairston's wife, Barbara Hairston, arrived at the office during the execution of the search warrant and gave agents written consent to search the apartment that she shared with Dr.

Hairston. She accompanied the agents to the apartment and opened the door for them with her key.  At a previous suppression hearing, an agent described the layout of the apartment.  The door opens to a living room/dining room.  Behind the common space was the kitchen.  A tiny hallway leads to a closet, bathroom and bedroom. The common room itself was in a state of disarray, which Mrs. Hairston attributed to the Hairstons' recent downsizing from a single-family home to an apartment. Stacks of tubs, boxes, file containers, paper bags, and papers littered the common room.  An agent testified that Mrs. Hairston conversed with him and his colleagues during the search.  For example, if the agent was looking at a stack of papers, she would tell him that those papers were tax papers or information on the house.  According to the agent, Mrs. Hairston seemed familiar with the contents of the apartment.

One particular tub was located under an electronic piano/keyboard in the common room; the tub was covered with a green cloth, a metronome, kitchen spoons and ladles, and other items. The tub bore no labels or markings suggesting the nature or owner of its contents.  Both parties agree that the tub was not locked.   Agents opened the lid of the tub easily, exerting no force to do so.  At no time did Mrs. Hairston object to the search of the tub.  Inside, agents found Bellosi-Mitchell's medical file and the files belonging to 12 other patients.  The agents could identify that the file belonged to Bellosi-Mitchell because the file tab was labeled.  The agents did not then open Bellosi-Mitchell's medical file but stacked the file on the ottoman in the common area.

Two hours later, Dr. Hairston returned home.  Bellosi-Mitchell's medical file had not been opened or moved from the ottoman.  Dr. Hairston himself also provided both oral and written consent to search the apartment and seize Bellosi-Mitchell's medical files. The agents removed her file from the apartment, made a copy of the file for the prosecutor, and stored the original file in evidence.

On September 29, 2010, Bellosi-Michell was indicted on one count of conspiracy to distribute and possess with intent to distribute controlled substances under 21 U.S.C. § 846 and one count of possession with intent to distribute controlled substances 21 U.S.C. § 841(a).  On April 4, 2011, the Grand Jury returned a superseding indictment and on December 21, 2011, the Grand Jury returned a second superseding indictment.  On, February 24, 2012, Bellosi-Mitchell filed a Motion to Suppress Medical Records.  On June 21, 2012, the Court held a hearing on this motion.

## II.  Discussion

### A. Bellosi-Mitchell's Motion to Suppress Medical Records will be denied because she did not have a reasonable expectation of privacy in these medical records

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. A "Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."  *Kyllo v. United States*, 533 U.S. 27, 33 (2001). In other words, a defendant enjoys the protections of the Fourth Amendment if she "has a legitimate expectation of privacy in the invaded place" or the item seized.  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978*); see United States v. Rusher*, 966 F.2d 868, 873–74 (4th Cir.1992). Because Bellosi-Mitchell had a subjective expectation of privacy with respect to her medical records, the first inquiry is whether her expectation of privacy was a reasonable one.   In determining whether an individual has a privacy expectation that the law recognizes as reasonable, courts will look to some "source outside of the Fourth Amendment." *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12. (1978)[1]

---

[1]  Just like their federal counterparts, Maryland courts determine the reasonableness of a defendant's expectation of privacy by looking to "a source outside of the Fourth Amendment,

**1. The inquiry into whether an individual has a Fourth Amendment reasonable expectation of privacy in her medical records is distinct and separate from whether an individual has a Fourteenth Amendment privacy right against compelled disclosure of medical information to the government.**

Before embarking on an analysis of the reasonableness of Bellosi-Mitchell's expectation of privacy in certain medical records, it is important to focus on the constitutional basis for the right asserted.  The inquiry into whether an individual has a reasonable expectation of privacy in her medical records under the Fourth Amendment is distinct and separate from whether an individual has a Fourteenth Amendment privacy right against compelled disclosure of medical information.  *See Katz v. United States*, 389 U.S. 347, 350-51 (1967) (Fourth Amendment privacy right "cannot be translated into a general constitutional right to privacy" under the Fourteenth Amendment).  The Supreme Court emphasized this point in the seminal case of *Whalen v. Roe*, 429 U.S. 589 (1977).  There, the Court addressed the question of whether a New York statute, which required prescriptions for drugs that had been classified "Schedule II" to be forwarded to the New York State Department of Health, invaded a constitutionally protected zone of privacy.  *Id.* at 598.  In holding that the New York statute was constitutional, the Court reasoned that, although the Fourth Amendment forbids government searches in areas where an individual has a reasonable expectation of privacy, the Fourth Amendment privacy interest was not at issue; rather, the only privacy right at issue was the Fourteenth Amendment's individual privacy right against compelled disclosure to the state.  *Id.* at 604. n.32   Unlike the Fourth Amendment analysis where one either has or does not have a reasonable expectation of privacy in the places searched during a criminal investigation, the Fourteenth Amendment analysis

either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  *See Laney v. State*, 370 Md. 522, 546 (2004) (citing *Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas*, 439 U.S. at 143-44 n. 12)); *see also Wallace v. State*, 373 Md. 69 (2003)

5

involves a balancing test in which courts weigh the individual's privacy interest against the rationale underlying the compelled disclosure of information to the government.  *Id.*  In *Whalen*, the court found that individuals had a Fourteenth Amendment privacy interest in health information but weighed this interest against the state's interest in monitoring and enforcing the laws against misuse of Schedule II drugs.  *Id.* at 603.  Because the statute mandated the capture of certain medical information but not necessarily the disclosure by the state of that information, the Court concluded that the statute did not "pose a sufficiently grievous threat to either interest to establish a constitutional violation." *Id.* at 603–04.

Indeed, lower courts have generally declined to extend *Whalen* to hold that patients have a Fourth Amendment expectation of privacy in their medical records.  *See Douglas v. Dobbs*, 419 F.3d 1097, 1102 (10th Cir. 2005) (finding that an Assistant District Attorney did not violate a pharmacy customer's Fourth Amendment right to be free from unreasonable search of her prescription records despite the fact that *Whalen* creates a Fourteenth Amendment right to be free from governmental disclosure of medical information); *State v. Skinner*, 10 So.3d 1212, 1218 (La. 2009) ("We are not prepared to extend *Whalen*, which balanced the individual's privacy interest against the state's reasonable exercise of its regulatory power, to … [Fourth Amendment] searches and seizures of its citizens' medical and pharmacy records for criminal investigative purposes").  *But see United States v. Lievertz*, 247 F.Supp. 2d 1052, 1063 (S.D. Ind. 2002) (applying *Whalen* to conclude that a patients' Fourth Amendment privacy rights were not violated by warrant-authorized search of medical records because the government's compelling interest in deterring criminal misconduct outweighed any of patients' privacy rights.).  Because this Court believes that the better-reasoned cases segregate an individual's Fourteenth Amendment  right to privacy—i.e. state actors who compel the disclosure of a patient's medical

information— from an individual's Fourth Amendment reasonable expectation of privacy, this Court will employ a similar approach.

> **2. Bellosi-Michell does not have a reasonable expectation of privacy in her medical records because Maryland courts have not interpreted the state constitution in a way that establishes such a privacy expectation.**

Some courts have found that individuals have a reasonable expectation of privacy in their medical records because state constitutions may create a constitutional right to privacy that extends to governmental searches of medical records and other confidential information voluntarily disclosed to third parties. *See King v. State*, 276 Ga. 126, 577 S.E.2d 764 (2003) (state constitutional right to privacy in personal medical records means that if records are to be obtained by subpoena, then person affected is to be given advance notice and opportunity to object, but such procedure is not necessary if records obtained pursuant to search warrant); *State v. Bilant*, 307 Mont. 113, 36 P.3d 883 (2001) (medical record information possessed by defendant's health care provider protected by guarantee of "informational privacy" in state constitution that is applicable in the Fourth Amendment context); *State v. Nelson*, 283 Mont. 231, 941 P.2d 441 (1997) (under state constitution, defendant had a protected privacy expectation in his medical records); *Skinner*, 10 So.3d at 1218 (same).

Maryland courts have not interpreted the state constitution in a way that establishes a reasonable expectation of privacy in situations where a third-party recipient of medical information provides that information to the government during a criminal investigation. Although Maryland courts have articulated a "constitutional right to privacy" in connection with medical records, this right to privacy is understood in a Fourteenth Amendment/*Whalen* context—i.e. state actors who compel the disclosure of a patient's medical information, not officers who merely request the voluntary production of records held by a non-governmental

third-party.  *See e.g., Dr. K. v. State Board of Physician Quality Assurance*, 98 Md. App. 103

(1993), cert. denied, 334 Md. 18, cert. denied, 513 U.S. 817 (1994).  In such "compelled

disclosure" cases, Maryland courts, just like the Court in *Whalen*, weigh a patient's constitutional

right to be free from the compelled disclosure of private medical records against the state's

interest in obtaining those records through an administrative process established by statute.  *See*

*Doe v. Maryland Board of Social Work Examiners*, 384 Md. 161, 862 A.2d 996 (2004)

(analyzing judicial actions to quash the subpoenas issued by the administrative agencies during

the agency's investigations by balancing the privacy interest that patients have in their medical

records with an administrative agency's need for such records); *Dr. K.*, 98 Md. App. at 115

(noting that in balancing the patient's privacy interest and the agency's need for the record, the

court should consider "the type of record requested, the information it contains, the potential for

harm in subsequent nonconsensual disclosure, the injury in disclosure to the relationship for

which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure,

the government's need for access, and whether there is an express statutory mandate,

articulate[d] public policy, or other public interest militating towards access.").  Thus, the

Fourteenth Amendment privacy interest incorporated into Maryland's constitution is distinct

from any Fourth Amendment interest.   Accordingly, the Maryland Constitution does not create a

reasonable expectation of privacy in the Fourth Amendment's search and seizure context.[2]

---

[2] At the hearing, Defendant argued that she had a reasonable expectation of privacy in her medical records because physician-patient communications are privileged.  At least one court has endorsed this line of reasoning in the context of the attorney-client privilege. *DeMassa v. Nunez*, 770 F.2d 1505 (1985) (holding that clients maintain a legitimate expectation of privacy in their client files for Fourth Amendment purposes because the attorney-client privilege alone confers on the client an expectation of privacy in his or her confidential communications with the attorney).   Other courts, however, segregate the issue of whether a communication is inadmissible at trial under the law of privilege from whether the investigative fruits of a privileged communication must be suppressed under the Fourth Amendment.  *See e.g., United*

**3. Under the third-party doctrine, Bellosi-Mitchell does not have a reasonable expectation of privacy in her medical records.**

The third-party doctrine is a Fourth Amendment rule that addresses privacy expectations with respect to information disclosed to another party. When a person voluntarily discloses information to a third-party, even for a limited purpose, the disclosing party assumes the risk that the third-party will reveal that information to the government and, as a result, ceases to have a reasonable expectation of privacy in such information. *See United States v. Miller*, 425 U.S. 435, 443 (1976); *United States v. White*, 401 U.S. 745, 751-752 (1971). For example, in *United States v. Miller*, 425 U.S. 435, 442–43 (1976), the Supreme Court held that a bank customer does not have a reasonable expectation of privacy with respect to his bank records. This is because, "checks are not confidential communications but negotiable instruments to be used in commercial transactions" and the bank customer voluntarily gave these documents to a third-party—i.e. the bank. Thus, under cases like *United States v. White*, 401 U.S. 745, 751-752 (1971), the "depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." Bellosi-Mitchell disclosed her medical information to a third party, her physician, Dr. Hairston, and thus has no legitimate expectation of privacy in this information. *See also Young v. Murphy*, 90 F.3d 1225 (7th Cir.1996) ("nursing

---

*States v. Irons*, 646 F. Supp. 2d 927, 957 (E.D. Tenn. 2009) (holding that the husband-wife communications privilege is a product of federal common law and it does not arise from Fourth Amendment protections, nor does it enjoy any constitutional basis).

Even if the law of privilege formed the basis of a Fourth Amendment privacy expectation, Defendant's argument is entirely without force. In Maryland, a "confidential or privileged relationship" is not "conferred by law" on every physician-patient relationship. In this regard, the Court of Special Appeals has observed that "there is no physician-patient privilege in Maryland. Communications made to a physician in his professional capacity by a patient are neither privileged under the common law of Maryland, nor have they been made so by statute. This has been the law in Maryland, and, except for a narrow exception ... in the mental health area, that remains the law of Maryland today." *Butler-Tulio v. Scroggins*, 139 Md. App. 122, 135-36 (2001). *See also, e.g., Robinson v. State*, 249 Md. 200, 221 (1968)

home records reporting his condition and treatment" did not enjoy Fourth Amendment protection).

There appear to be exceptions to the third-party doctrine. In determining whether there is an exception to the third-party doctrine, the key inquiry is whether investigators must get a court order prior to using third-party information in a criminal case or risk, per statute, the exclusion of such information. For example, in *Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000), the Fourth Circuit held that a patient receiving treatment at a methadone clinic has a reasonable expectation of privacy in his records even though those records were kept at that clinic and the patient voluntarily divulged information relating to substance abuse to a third-party—i.e. a health care provider. The court reasoned that the patient's expectation of privacy was imminently reasonable given that Congress enacted a specific statute—42 U.S.C. § 290dd–2—that is designed to protect the confidentiality of records of "the diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research" where such treatment occurs in federally-assisted drug abuse programs. *Id.* § 290dd–2(a). The reasonableness of the patient's expectation of privacy is primarily reinforced by the fact that the statute prohibits the use of medical records created in the process of federally-funded substance abuse treatment "[e]xcept as authorized by a court order." *Id.* § 290dd–2(c). Should law enforcement obtain such records in the absence of a court order, this information may not be used "to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient." *Id.*; *see also United States v. Mosby*, No. 3:08-CR-127, 2008 WL 2961316 at *6 n.7 (E.D.Va. July 25, 2008) (limiting the a patient's reasonable expectation of privacy with respect to medical records to those records generated during the course of substance

abuse treatment because 42 U.S.C. § 290dd-2 forbids the use of such records in criminal investigations unless law enforcement obtains a court order prior to any search); *c.f. People v. Gutierrez*, 222 P.3d 925 (Colo. 2009) (holding that state and federal laws, which shield a taxpayer's return from unfettered access by government officials, express and affirm the taxpayer's reasonable expectation of privacy in information disclosed to the Internal Revenue Service (IRS) or to a state department of revenue in a tax return).[3]

If a law does not require investigators to get a court order prior to using information provided by a third-party in criminal case, courts are reluctant to find that the individual has a reasonable expectation of privacy in that information. For example, in *United States v. Miller*, 425 U.S. 435, 442–43 (1976), the Supreme Court held that a bank customer does not have a reasonable expectation of privacy with respect to his bank records. This is because "checks are not confidential communications but negotiable instruments to be used in commercial transactions" and the bank customer voluntarily gave these documents to a third-party—i.e. the bank. The court reached this conclusion, in part, because the Bank Secrecy Act required banks to preserve bank records because they "have a high degree of usefulness in criminal tax, and regulatory investigations and proceedings." 12 U.S.C. § 1829b(a)(1).[4]

Here, Bellosi-Mitchell argues that she has a reasonable expectation of privacy with

---

[3] Bellosi-Mitchell does not fall under the protections of the statute described in *Broderick*. Section 290dd-2 applies to federally assisted drug and alcohol treatment programs. 42 U.S.C § 290dd–2(a). At the hearing, an agent testified that DEA diversion officers interviewed Dr. Hairston in advance of the search to ensure that he did not have any "Suboxone patients" in his practice. *See* Transcript, ECF No. 121 at 40: 17-22.Suboxone ® or Buprenorphine is a drug used to treat addiction to opiates. Because it does not appear that Dr. Hairston's practice involved substance abuse treatment, Bellosi-Mitchell cannot use *Broderick* in support of her Fourth Amendment argument.

[4] This provision is no longer in force. In response to *United States v. Miller*, Congress passed the Right to Financial Privacy Act of 1978. *See* Pub. L. No. 95-630, Title XI, § 1101, 92 Stat. 3697.

respect to her medical records given that HIPAA (The Health Insurance Portability and Accountability Act of 1996 Pub. L. No. 104-191, 110 Stat. 1936) prohibits health care providers and other covered entities from disclosing a patient's medical records in most circumstances. This argument is not a persuasive one.

Like the statute in *Broderick*, HIPAA allows a health care provider to use or disclose protected health information without authorization of the individual if a law enforcement official seeks such information for a law enforcement purpose "in compliance with and as limited by the relevant requirements of a court order or court-ordered warrant, or a subpoena or summons issued by a judicial officer." 45 C.F.R § 164.512(f)(1)(ii)(A).  However, the statutory scheme in *Broderick* differs from that established under HIPAA in one key respect: while the statute in *Broderick* provides that any record obtained without a court order cannot be used "to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient," 42 U.S.C § 290dd-2(c), HIPAA contains no such provision.  Under HIPAA, if a health care provider discloses confidential information to the government without a court order, the health care provider is liable to the patient for civil damages.  For this reason, HIPAA enables health care providers and other covered entities to refuse to provide the medical records and/or move to quash any order.  *See e.g., United States v. Zamora*, 408 F. Supp. 2d 295, 298 (S.D. Texas 2006). HIPAA provides no recourse for a patient with respect to the government because law enforcement agencies and prosecutors are not "covered entities" under HIPAA.  *See United States v. Elliott*, 676 F.Supp.2d 431, 439-440 (D. Md. 2009).  Thus, the instant case more closely resembles *United States v. Miller*, albeit without the explicit statutory acknowledgement that medical records have a high degree of usefulness in prosecution of drug cases.

HIPAA, just like the Bank Secrecy Act in *Miller*, does not forbid the government from

using information it received from a third-party even if the patient or bank customer believed such information was confidential. *See People v. Perlos*, 436 Mich. 305, 462 N.W.2d 310 (1990) (applying *Miller* to hold that "once the hospitals obtained the results for medical purposes, it would have been unreasonable for defendants to assume that the results would necessarily remain private"); *Thomas v. Carrasco*, No. 1:04–cv–05793–MJS, 2010 WL 4024930, at *4-5 (E.D. Cal 2010) (holding no reasonable expectation of privacy with respect to medical records because "as a general rule, a person only has a Fourth Amendment expectation of privacy in documents that he owns or possesses" and "the medical records at issue here were maintained by the State and possessed by the State").   Because HIPAA does not require investigators to obtain an order prior to using third-party information in a criminal case, this Court is reluctant to find that Bellosi-Mitchell had a reasonable expectation of privacy in her medical file.

Maryland's Confidentiality of Medical Records Act does not establish a reasonable expectation of privacy. *See e.g.*, MD Code, Health - General, § 4-301 *et seq*.  The Act does not require investigators to get a court prior to using third-party information in criminal case.  Under the Act, a health care provider has a general to duty to keep medical records confidential, subject to certain exceptions. *See* MD Code, Health - General § 4-302.  In certain situations, a health care provider is required to disclose a medical record without authorization of the patient. *See* MD Code, Health - General § 4-306; *Doe v. Maryland Bd. of Social Workers*, 154 Md. App. 520, cert. granted, 381 Md. 324, aff'd 384 Md. 161 (2004) (Disciplinary Boards); *Law v. Zuckerman*, 2004, 307 F. Supp. 2d 705 (D. Md 2004) (civil action where party puts his medical condition at issue).  The Act also includes a permissive disclosure provision, which allows for disclosure without patient authorization. The relevant portion of the statute provides that a health care

provider can voluntarily disclose medical information without prior authorization from the patient:

> (3) Subject to the additional limitations for a medical record developed primarily in connection with the provision of mental health services in § 4-307 of this subtitle, to a government agency performing its lawful duties as authorized by an act of the Maryland General Assembly or the United States Congress;

MD Code, Health - General § 4-305.  On the basis of this very provision, Judge Ellen Hollander[5] held that Maryland courts would not infer an exclusionary rule as a remedy for a violation of Confidential Medical Records Act, where the General Assembly did not authorize such a remedy. *Dorsey v. State*, 185 Md. App. 82 (2009).  Although Maryland's Confidentiality of Medical Records Act is designed to protect information that is voluntarily given to third-parties (i.e. health care providers), there is no reasonable expectation of privacy with respect to medical records because Maryland's Confidentiality of Medical Records Act does not require investigators to get a court order prior to using third-party information in criminal case or risk the exclusion of that information.

### 4. The Supreme Court's decision in *Ferguson v. City of Charleston* does not establish a reasonable expectation of privacy with respect to medical records.

In an effort to establish that she has a reasonable expectation of privacy with respect to her medical records, Bellosi-Mitchell cites to *Ferguson v. City of Charleston*, 532 U.S. 67, 121 (2001).  There, the Court did not address the applicability of the third-party doctrine to medical records generally.  The only issue before the Court was whether state-actors—i.e. state hospital employees—conducted a Fourth Amendment search by taking urine samples from pregnant mothers to test for cocaine and turning over those cocaine test results to law enforcement.

---

[5] Judge Ellen Hollander was then a judge of the Court of Special Appeals of Maryland.  She is now a member of this Court.

Unlike *Ferguson*, the instant case does not involve a situation where the state takes medical

information directly from the patient but rather a situation where the patient provides medical

information to a non-state-actor, her physician, and that non-state-actor (physician) voluntarily

provides this information to the state.   The Tenth Circuit's analysis of *Ferguson v. City of*

*Charleston* reinforces this distinction:

> *Ferguson* held that state hospital employees conducted an unlawful
> search in violation of the Fourth Amendment by taking urine
> samples from pregnant mothers without their consent in order to
> test them for cocaine and provide the results to law enforcement
> for use against the patients. *Id*. at 77, 84–85, 121 S.Ct. 1281. In
> reaching its result, the Court took care to emphasize that the only
> search at issue was the taking and testing of urine for police use.
> *See id*. at 78 n. 13, 121 S.Ct. 1281. The Court expressly left open
> whether disclosure of preexisting medical records held by the
> hospital would also be a search implicating the Fourth
> Amendment. *Id*. at 77 n. 9, 121 S.Ct. 1281. In fact, the Court even
> acknowledged that in some situations a patient might well "expect
> that members of the hospital staff might turn over evidence"
> without his or her consent. *Id*. at 78 n. 13, 121 S.Ct. 1281. And
> after the Supreme Court remanded the case to the Fourth Circuit,
> that court, too, held only that the hospital's nonconsensual "taking
> and testing" of urine for law enforcement purposes was an
> unlawful search, and again expressly declined to decide "whether
> the disclosure of test results to law enforcement also implicate[s]
> the Fourth Amendment." 308 F.3d 380, 395 (4th Cir.2002).

*Kerns v. Bader*, 663 F.3d 1173, 1185 (10th Cir. 2011).   This Court finds the Tenth Circuit's

analysis to be persuasive and, thus, will not extend the holding of *Ferguson* to this case.

Accordingly, Bellosi-Mitchell did not have a reasonable expectation of privacy in her medical

records.

B. Even if Bellosi-Mitchell had a reasonable expectation of privacy in her medical records, the
warrantless search of these medical records is valid under the doctrine of consent

If Bellosi-Mitchell had a reasonable expectation of privacy in her medical records then

the warrantless search of those records is "per se unreasonable under the Fourth Amendment

subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).   One of those "well-delineated" exceptions is consent.   An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.   *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).   When one person consents to a search of property owned by another, the consent is valid if "the facts available to the officer at the moment . . .   warrant a man of reasonable caution in the belief that the consenting party had authority over the premises."   *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22, (1968) (other citations omitted).

**1. Dr. and Mrs. Hairston had actual authority to consent to the search and seizure of Bellosi-Mitchell's medical records**

A third-party has actual authority to consent to a search of property when she possesses "common authority over or other sufficient relationship to the ... effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164 (1974).   Common authority does not rest merely on whether the consenting party has a property interest with respect to the area searched.   Rather, it depends on whether the consenting party has "mutual use" or "joint access or control for most purposes" such that it is "reasonable to recognize that any of the co-[users] has the right to permit the inspection in h[er] own right and that the others have assumed the risk that one of their number might permit the common [effects] to be searched." *Id*. at 171 n.7.

In evaluating whether the consenting party has common authority with respect to files or objects in containers, courts look to the degree to which the party seeking suppression "affirmatively intended to exclude ... others from his personal files." *Trulock*, 275 F.3d 391, 403 (4th Cir. 2001).   For example, in *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978), the court held invalid the warrantless search of a locked footlocker based solely on the consent of the defendant's mother.   This is because the police "specifically confronted a secured container that

required force to open and a custodian-owner of the general premises who both asserted the absent person's claim of privacy over it and disclaimed for herself any shared right to access it." *Id.*; *see also United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (holding that wife did not have actual authority to consent to a search of her husband's password-protected files because she did not share "mutual use, general access or common authority" over those files.).

The first issue in determining whether the search was supported by actual authority is whether Mrs. Hairston had "common authority over or other sufficient relationship" to the tub and its contents such that she had actual authority to give consent to the agents to search that tub. Mrs. Hairston had actual authority to give consent to open and search the tub because the tub in question was in a common area, unsealed and unlocked.  Mrs. Hairston never disclaimed authority over the tub or its contents.  Neither Dr. Hairston nor Bellosi-Mitchell put any locks or passwords in place that "affirmatively intended to exclude" Mrs. Hairston from opening the tub.

The next issue is whether Dr. and Mrs. Hairston had "common authority over or other sufficient relationship" to the medical files within the tub.  This is a closer question.  Although neither Bellosi-Mitchell nor Dr. Hairston made any effort to affirmatively prohibit Mrs. Hairston from relocating Bellosi-Mitchell's medical file to the ottoman, the agents took the extra step to obtain Dr. Hairston's consent before seizing the file and removing it from the apartment.  Dr. Hairston's consent to the seizure and search of Bellosi-Mitchell's medical records is valid because Dr. Hairston created these records in his office in the course of his treatment of Bellosi-Mitchell and thus had common authority over those records. *C.f. United States v. Aldridge*, 642 F.3d 537 (7th Cir. 2011). (finding Corporate director's wife had authority to consent to Securities and Exchange Commission's (SEC) warrantless search of box of corporate records, and thus the search did not violate Fourth Amendment, based on her joint custody over the box of documents

17

that the director had given to his wife with instructions to dispose of them, his indication to wife that box contained CDs pertaining to the corporation's dealings, and the fact that the box was unlocked); *United States v. Moon*, 513 F.3d 527 (8th Cir. 2008) (finding Physician, suspect in health care fraud investigation, voluntarily consented to state/federal agents' request to search her patient records, i.e. did not merely acquiesce to claim of lawful authority, and thus warrantless search was reasonable under Fourth Amendment)

### 2. Even if Dr. and Mrs. Hairston lacked actual authority to consent, they had apparent authority to consent to the search of the Bellosi-Michell's medical records

Even if the Hairstons lacked actual authority to consent to the search of Bellosi-Mitchell's health records, the inquiry does not end. The Government need not establish actual authority; it would be sufficient if Mrs. Hairston had apparent authority to consent to the search. *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). As long as "the facts available to the officer at the moment ... 'warrant a [person] of reasonable caution in the belief' that the consenting party had authority," apparent authority to consent exists, and evidence seized or searched pursuant to that consent need not be suppressed. *Id.*

Looking at the totality of the circumstances, the agents acted reasonably. First, the tub was located in a common area of the apartment, which was cluttered with containers and stacks of papers. Second, it was not locked or sealed. Third, Mrs. Hairston gave her consent to search the common area and never disclaimed authority over the tub or the contents therein. Fourth, Dr. Hairston consented to the search of his home and the Bellosi-Mitchell's medical records. Fifth, courts and commentators have noted that the law regarding medical records and consent is far from clear. *See e.g., Kerns v. Bader*, 663 F.3d 1173, 1184-85 (10th Cir. 2011)(explaining the Supreme Court has not definitively ruled on the applicability of the third-party doctrine to

medical records and that lower courts are in disagreement).[6]   Looking at the state of the law regarding medical records and the circumstances surrounding the consent search, the agents acted reasonably in concluding that Dr. and Mrs. Hairston had apparent authority to consent.

### Conclusion

For the foregoing reasons, the Court will, by separate Order, deny the Defendant's Motion to Suppress Medical Records.

Date:   September 5, 2012                                    _____
                                                                        /s/
                                                                ROGER W. TITUS
                                                        UNITED STATES DISTRICT JUDGE

---

[6] As a final note, the Government argues that even if there was a Fourth Amendment violation, the exclusionary rule should not apply.  The Government cited the Supreme Court's decision in *Herring v. United States*, 555 U.S 135 (2009).  Under *Herring*, evidence should be excluded only when it is obtained through "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  *Id*. at 144.  Because this Court already applied *Illinois v. Rodriguez* to find that the agents acted reasonably in assuming that the Hairstons had apparent authority to consent, this Court is reluctant to relitigate the reasonableness of the agents' conduct by applying the *Herring* "deliberate, reckless, or grossly negligent" standard.

Should *Herring* apply to consent searches, then the agents did not obtain the Defendant's medical files through "deliberate, reckless, or grossly negligent conduct."   The Court reaches this conclusion for the same reasons it finds that the agents acted reasonably under the totality of the circumstances standard for consent searches.